[Cite as *Edwards v. Edwards*, 2013-Ohio-117.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| JENIFER L. EDWARDS | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.    25309 |
| v. | : | T.C. NO.    10DR279 |
| GEOFFREY L. EDWARDS | : | (Civil appeal from Common Pleas Court, Domestic Relations) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____18th_____ day of _____January_____, 2013.

. . . . . . . . . .

ANTHONY F. COMUNALE, Atty. Reg. No. 0062449, 130 W. Second Street, Suite 1444, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

DALMA C. GRANDJEAN, Atty. Reg. No. 0024841, One South Main Street, Suite 1590, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1}    Geoffrey Edwards appeals from a judgment of the Montgomery County

Common Pleas Court, Domestic Relations Division, which awarded sole custody of the parties' minor children to Jenifer Edwards, ordered child and spousal support to be paid to Jenifer, and used a coverture fraction calculation to divide Geoffrey's non-vested military retirement benefits.

{¶ 2}    For the reasons discussed below, we conclude that the trial court did not abuse its discretion in allocating parental rights, in retaining jurisdiction over the amount and duration of the spousal support obligation, or in using a coverture fraction calculation to divide the non-vested military retirement benefits. The court did err in failing to credit Geoffrey with payments made on an automobile that belonged to the parties.

I.   Facts and Course of Proceedings

{¶ 3}    Jenifer and Geoffrey Edwards were married in September 1998, and separated in October 2009.  Jenifer[1] and the parties' two minor children, eight and almost four years of age, stayed in the marital home until the end of December 2009, when both Jenifer and Geoffrey obtained separate housing.  The parties disagreed at trial about what the support agreement was at this time.  Geoffrey testified that he agreed to pay $1,000 per month in support, while Jenifer contended that Geoffrey agreed to pay her rent and utilities for six months.  After that, he was supposed to pay $1,000 a month and take care of whatever else she and the children needed.  At the time, Geoffrey was making about $40,000 per year as a member of the Air Force, not including military housing allowances. The parties also owed monthly payments of $450 to $500 each on two automobiles – a 2004

---

[1] We will use the parties' first names to lessen confusion.

Dodge Caravan that Jenifer drove, and a 2005 Nissan Altima that Geoffrey drove. Jenifer had been a stay-at-home mother for most of the marriage, and was not employed outside the home at the time of the separation. Her monthly rent at the new residence was $550.

{¶ 4}    Geoffrey paid the security deposit for Jenifer's apartment and also paid Jenifer $1,000 in January. Further, he paid Jenifer approximately $2,345 between February 10 and April 14, 2010, gave her $1,000 in February 2010 from a tax refund of $4,750 that he had received, and paid about $165 in child care expenses. After the parties established separate residences, they agreed to shared parenting, in which the children spent equal time with each parent. They split weekdays equally, and alternated weekends.

{¶ 5}    Jenifer filed a complaint for divorce in March 2010, requesting temporary custody, child support, and spousal support. Geoffrey filed an answer and counterclaim in April 2010, requesting shared parenting. Neither party was granted temporary custody, and no temporary support was ordered. However, a temporary restraining order was filed on April 30, 2010, preventing Jenifer from removing the minor children from the State of Ohio, except temporarily for a period of 14 days or less, for a scheduled vacation.

{¶ 6}    Prior to the time the restraining order was filed, Jenifer removed the oldest child from school. After Geoffrey returned the children from visitation on April 25, 2010, Jenifer took the children to Missouri to live with her parents, because she could not afford to take care of the children in Ohio. At the time, Jenifer knew that Geoffrey was scheduled to start a military academy in Tennessee on April 25. The academy was scheduled to end at the beginning of June. Up to that point, or at least since establishing separate residences, Jenifer and Geoffrey had shared equal parenting time. Jenifer did not tell Geoffrey she was

leaving, and concealed her departure from him. However, no restraining order had been filed before she left, nor was she aware that Geoffrey contemplated filing such an order.

**{¶ 7}** On May 3, 2010, Geoffrey filed a motion for an ex parte temporary custody order based on the removal of the children, and the court set a hearing for May 13, 2010. On May 10, 2010, Geoffrey was ordered to pay temporary spousal support of $433.50 per month through the Support Enforcement Agency beginning May 14, 2010, and an additional $799.19 monthly in temporary spousal support, beginning May 1, 2010. The latter amount could be paid as mortgage or rent and basic utility payments. No order was made regarding temporary custody.

**{¶ 8}** An agreed order was then filed on May 18, 2010, allocating parenting time on an equal basis, with two weeks at a time for each parent, beginning May 22, 2010. At that point, such an arrangement would be sensible since the elder child would be out of school for summer vacation. Temporary support was reduced to $1,000 per month, beginning June 1, 2010, to be paid in two installments per month, through the support enforcement agency. The order further provided that for May 2010, Geoffrey would pay $500 toward the monthly van payment and $500 directly to Jenifer. In addition, the order stated that if Jenifer failed to pay the van payments, Geoffrey was entitled to redirect part of the temporary spousal support to pay for it. A guardian ad litem was also appointed.

**{¶ 9}** In June 2010, Geoffrey filed a motion for shared parenting, based on Jenifer's representation that she would be moving back to Ohio. Geoffrey proposed equal parenting time and shared legal custody, and asked that his residence be chosen for school purposes.

{¶ 10}   Jenifer returned to Ohio in July, and the parties resumed the parenting arrangement they had used before she left in May, with each parent having equal time. Jenifer filed an emergency motion to relocate on October 1, 2010, and a hearing was set for October 21.   However, prior to the hearing, Jenifer removed the children from the State again on October 7, 2010, to move back to Missouri.    Jenifer had been employed for about four months, but was evicted from her apartment in October 2010.

{¶ 11}   There was a dispute about whether Jenifer informed Geoffrey of her intentions.   In late October, Geoffrey did file a motion to show cause, and a hearing was set on the motion for early January 2011.   That hearing, however, was continued due to the illness of one of the minor children, and was reset for February 2011.   There is no indication that the trial court ever held a hearing or ruled on the pending motion.

{¶ 12}   The final hearing in the divorce action was held in January 2012, at which time the court heard testimony from both parties.   The court also considered the reports of the guardian ad litem.   In May 2012, the trial court issued its decision, awarding Jenifer sole custody of the minor children and allowing Geoffrey eight weeks of summer parenting time. The court ordered Geoffrey to pay child support of $376 per month per child, and $1,000 in spousal support per month for 36 months, subject to the continuing jurisdiction of the court as to both amount and duration.    In addition, the court ordered Jenifer to pay for the debt on the van, which had been repossessed, since she failed to use spousal support to pay for it. And finally, the court used a coverture formula to compute Jenifer's share of Geoffrey's military retirement pay.   Geoffrey appealed from the judgment and decree of divorce.

II.   Did the Trial Court Make Findings that are Unsupported by the Record?

{¶ 13}    Geoffrey's first assignment of error states that " [t]he trial court committed prejudicial error when it made findings that are not supported by the record."   Under this assignment of error, Geoffrey challenges three findings.   The first finding involves the judge's determination that Jenifer's testimony was credible.   In this regard, Geoffrey points to several situations in which Jenifer allegedly demonstrated a lack of credibility, including removing the children from the state without consent; failing to disclose bank records; and denying certain matters in response to the request for admissions, while admitting the same matters as true at trial.

{¶ 14}    Generally, appellate courts defer to the trial court's decision on credibility. "The 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "   *In re J.Y.*, 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33, quoting from *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1980).

{¶ 15}    In the case before us, the trial court heard the testimony and observed the witnesses.   While there were times that Jenifer's testimony differed from her written responses to admissions, the trial court was entitled to reach its own conclusions on the subject.   Furthermore, while removing children from the geographic location of the other parent is not the best course of conduct, there were factors that the trial court was entitled to consider and credit on Jenifer's behalf.   First, the evidence indicates that during the parties' marriage, they lived with Jenifer's parents in Missouri for nine months, and Jenifer also

stayed with her parents on several occasions for lengthy periods when Geoffrey was in training or was deployed. Thus, staying with Jenifer's parents was a consistent practice during times that Geoffrey attended training, as he planned to do in April to June 2010, when she left the first time.

{¶ 16}    Furthermore, when Jenifer left for Missouri the first time, the restraining order had not yet been filed, and she did not knowingly violate a court order.   Jenifer left due to financial distress and at a time when Geoffrey was entering training for a few months – making her departure for her parents' home not an illogical choice.   Again, this credits Jenifer's testimony as the trial court was entitled to do.   Finally, the second time that Jenifer left, she was being evicted and she did file a motion for emergency custody – which the trial court never decided.   Whether this was due to oversight or because Geoffrey failed to press the issue is not clear from the record.

{¶ 17}    The standard generally used to review trial court decisions in domestic relations cases is  "abuse of discretion."  *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).   An abuse of discretion " ' implies that the court's attitude is unreasonable, arbitrary or unconscionable.' "  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting from   *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).   After reviewing the evidence, we cannot conclude that the trial court's decision about Jenifer's credibility was an abuse of discretion.   The trial court was in the best position to observe the demeanor of the parties.

{¶ 18}    The second finding that Geoffrey challenges is the trial court's conclusion that Geoffrey's band involvement would cause him to have significantly less time with his

children. Our review indicates that the evidence on this point is conflicting. Jenifer testified that Geoffrey spent substantial time on his band and band practice, and Geoffrey testified that he would quit the band if that were appropriate, in order to care for the children. The trial court resolved this conflict in Jenifer's favor, and there is evidence in the record to support the decision. We cannot say the trial court's finding was an abuse of discretion.

{¶ 19} The third challenged finding is the trial court's conclusion that Geoffrey is not entitled to payments made to third-party creditors for the parties' debts during the period of divorce litigation. Geoffrey contends that he should be entitled to additional credit against his arrearage for all van payments made on Jenifer's behalf between June and September 2010,which total $1,304.22.

{¶ 20} The trial court credited Geoffrey with $1,224.19 for an arrearage assessed by the support enforcement agency, based on the fact that Geoffrey had paid Jenifer for the month of May 2010, and had paid the van payment of $500. The court noted that the agreed order of May 18, 2010, authorized Geoffrey to redirect part of the temporary spousal support to pay the van obligation. However, the trial court did not give Geoffrey credit for any further van payments, and concluded, after subtracting the credited amount, that Geoffrey's support arrearage was $1,750.

{¶ 21} Geoffrey testified at trial that, after May, he paid toward the van through December 2010, and should be credited with those amounts, totaling $2,644.22, against any arrearage. In support of his testimony, Geoffrey submitted Exhibit F, which is a spreadsheet showing various payments made to Jenifer or on her behalf since May 2010. The

spreadsheet indicates that in addition to the $500 May payment already credited by the trial court, Geoffrey made payments of $843.50 to Citifinancial Auto, via money order, on August 12, 2010; $460.72 to Santander (the company that disposed of the van), via USAA automatic withdrawal, on September 16, 2010; and $280 to Santander, via USAA automatic withdrawal, on October 20, 2010. These amounts are supported by documents attached to the spreadsheet, which show actual payments for the van in a total amount of $1,575.72.[2]

{¶ 22} Because Jenifer failed to submit any evidence to contest these payments, we agree with Geoffrey that the trial court's decision regarding the van payments is not supported by the evidence, and that the court erred in failing to credit Geoffrey with the amount of the van payments. Accordingly, the first assignment of error is sustained in part. The trial court is ordered, on remand, to credit $1,575.72 towards the $1,750 arrearage.

{¶ 23} The first assignment of error is overruled in part and is sustained in part.


III. Did the Trial Court Abuse its Discretion regarding the Custody Award?

{¶ 24} Geoffrey's Second Assignment of Error states that "It was an abuse of discretion and against the manifest weight of the evidence for the trial court to award custody to mother." Geoffrey contends that the trial court failed to make findings regarding relevant factors for shared parenting and improperly discounted the recommendations of the guardian ad litem. Geoffrey also argues that if the trial court had concluded that shared parenting was not in the best interests of the children, then the factors in R.C. 3109.04(F)(1)

---

[2]The actual payments do not include an $8.50 fee which was paid to send a money order of $835 to Citifinancial Auto. ($1,584.72 — the total from the spreadsheet — minus $8.50 equals $1,575.72.)

would weigh more heavily in awarding custody to him.

{¶ 25} Geoffrey filed a motion for shared parenting, and a plan for shared parenting, but Jenifer did not. In situations such as this, R.C. 3109.04(A)(1) allows trial courts to reject shared parenting if it is not in the best interests of the children, and to allocate the parental rights and responsibilities for the children's care primarily to one parent. If the court rejects a shared parenting plan and proceeds as if the request has not been made, the court is required to enter findings of fact and conclusions of law as to the reasons for the rejection. R.C. 3109.04(D)(1)(a)(iii). However, the court has discretion, as it does in other domestic relations matters, in deciding whether a shared parenting plan should be approved. R.C. 3109.04(D)(1)(b).

{¶ 26} R.C. 3109.04(F)(1)(a)-(j) provide a set of factors that the court uses to decide the best interests of the child. These factors include: (a) the parents' wishes; (b) the child's wishes, if the court has interviewed the child; (c) the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; (d) adjustment of the child to home, school, and community; (e) the mental and physical health of all involved persons; (f) which parent is more likely to honor parenting time rights; (g) any failure to make child support payments, including arrearages; (h) any prior convictions involving abuse, neglect, or sexually oriented offenses involving family members: (i) conscious and willful denial of the other parent's right to court-ordered parenting time; and (j) whether either parent has established a residence or plans to establish a residence outside the state.

{¶ 27} In addition to these factors, when the court considers shared parenting, it is

required to consider: (a) the parents' ability to cooperate and make joint decisions about the children; (b) each parent's ability to encourage sharing, love, and affection of the child with the other parent; (c) any history of child abuse, domestic violence, or parental kidnapping; (d) the parents' geographic proximity as it relates to the practical consideration of shared parenting; and (e) the guardian ad litem's recommendations. R.C. 3109.04(F)(2).

{¶ 28} In *Meyer v. Anderson*, 2d Dist. Miami No. 01CA53, 2002 WL 1251449 (June 7, 2002), we stressed that:

> The general R.C. 3109.04(F)(1)(a)-(j) "best interest" factors applicable to every custody determination relate primarily to the health and well-being of the child and the parents. The R.C. 3109.04(F)(2)(a)-(e) factors set out above relate more specifically to the capacity of the parents to carry out a shared parenting plan.
>
> "Shared parenting" is the product of efforts to avoid the pain of loss inherent in the sole custody alternative, for both the parents and their child. It purports to continue, as nearly as possible, the joint parent and child relationships which exist in a marriage. Successful shared parenting requires at least two things. One is a strong commitment to cooperate. The other is a capacity to engage in the cooperation required. The R.C. 3109.04(F)(2) factors measure both components. *Id.* at * 2-3.

{¶ 29} The trial court rejected shared parenting and awarded primary custody to Jenifer after considering the appropriate statutory factors. The court noted that Jenifer had been the primary caretaker for the children as a stay-at-home mother, while Geoffrey had worked full-time and had been involved in music during his off-work hours. The court noted Jenifer's testimony that she had relocated to Missouri for financial reasons, because

she and the children were going to be evicted from their home. In addition, the court concluded that the children had assimilated into their community in Missouri and had friends in their school community and in their home environment. The court also stressed that Jenifer had a substantial support system available in Missouri that Geoffrey did not have in Ohio. These conclusions are substantially supported by the evidence.

{¶ 30} Geoffrey contends that the court failed to consider that the parties had managed to co-parent the two children during the time between their separation and the final hearing. He also challenges the court's failure to follow the recommendations of the guardian ad litem, who stated that it would be in the best interests of the children if Jenifer returned to Ohio and the parties had a shared parenting plan.

{¶ 31} Before addressing these matters, we note the Ohio Supreme Court's instruction that:

> The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. (Citations omitted.)
>
> *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶ 32} In *Miller*, the Ohio Supreme Court did indicate that a trial court's broad discretion is not unlimited and must be guided by R.C. 3109.04. *Id.* Thus, a trial court's

decision can be reversed for abuse of discretion. *Id.*

{¶ 33} After reviewing the evidence and the trial court's decision, we cannot conclude that the trial court acted unreasonably, arbitrarily, or capriciously. In the first place, the trial court did consider the report of the guardian ad litem (GAL), but chose not to follow the GAL's final recommendation. "A trial court is not bound to follow a guardian ad litem's recommendation." *Lumley v. Lumley*, 10th Dist. Franklin No. 09AP-556, 2009-Ohio-6992, ¶ 46.

{¶ 34} The GAL in this case filed three reports. In the first report, the GAL recommended that the minor children stay with their mother in Missouri. In the second report, the GAL interviewed numerous persons, including the maternal aunt, who lived in the Dayton area, and with whom Jenifer and the children had stayed for six weeks when they returned to Ohio in the summer of 2010. The GAL noted that the aunt had stated that Jenifer was an excellent parent who put her children's needs above her own. The aunt also stated that "it would be devastating to both the children and the mother if they were separated," and that Jenifer did not have a strong enough support system in Ohio to remain there. Supplemental GAL Report, p. 4.

{¶ 35} In the supplemental report, the GAL recommended shared parenting, but also recommended that Jenifer should be the residential parent if the parties could not agree on a shared parenting plan. The GAL pointed out factors that would weigh against Jenifer, including some instability shown while she was in Ohio. The GAL concluded that these points were outweighed by the fact that Jenifer had been the primary caregiver and that changing the arrangement could be devastating to the children. The GAL indicated that her

recommendation could change if Jenifer were unwilling to work at allowing the father more time with the children or demonstrated the instability she had shown in Ohio.

{¶ 36}    In the final report, the GAL concluded that it would be in the children's best interests if Jenifer returned to Ohio and the parties had a shared parenting plan.  If Jenifer were unwilling to return to Ohio, the GAL recommended that Geoffrey be designated the residential parent.    The GAL noted that Jenifer had improved regarding facilitating visitation, but there were still some issues because Jenifer had failed to travel with the children on 25% of the visits due to illness of problems with her vehicle.   The GAL stressed that no deliberate denial of visitation had occurred.   No current stability issues were noted; instead, the GAL only mentioned issues that occurred prior to the time that Jenifer left Ohio.

{¶ 37}    The GAL did note that if the children resided with their father, he would need to either quit his band or severely limit time with the band, because it would not be fair to the children for the father to work full-time and then spend his spare time with his band.

{¶ 38}    In deciding custody, the trial court mentioned these issues and the GAL's final recommendation. However, the court also noted that the GAL had previously recommended that Jenifer should be designated the residential parent if the parties were unable to enter into shared parenting.  The court stressed that Jenifer had been living in Missouri with the children since October 2010 (more than a year and a half prior to the court's decision), and that the children were doing well in their present environment.  The court also placed reliance on the undisputed fact that Jenifer had been the primary caregiver, and that Geoffrey did not begin taking the children alone overnight for several months after the parties separated.  Further, the court stressed that Geoffrey was very involved with his

musical hobby and would have significantly less time to spend with the children than their mother. Again, the record contains substantial evidence supporting these findings, and on the areas where the evidence was disputed, the trial court credited Jenifer's testimony. For example, Geoffrey testified that his band practices once a week and that he would quit the band if it were appropriate to care for the children. On the other hand, Jenifer testified that Geoffrey's band responsibilities took him away from the home three to five days a week for practices and shows. She also said that when she was in Ohio and the parties had split custody, Geoffrey often rescheduled parenting times due to band practices. In her words, everything "centered around the band."

{¶ 39} Another example is that Geoffrey testified that Jenifer had problems with financial management and had anxiety attacks when they were married. Jenifer admitted that she suffers from a generalized anxiety disorder, for which she takes medication, but there is no evidence that her condition interferes at all with the care of the children. By all accounts, the children behave appropriately and are doing well in school and their home environment. Furthermore, on the subject of financial management, both parties appear to have been unrealistic about how they would maintain their former standard of living, when Jenifer had been essentially a stay-at-home mother during the marriage and had few remunerative skills. Since moving to Missouri, Jenifer had, by the time of trial, completed most of the course work for an associate's degree in medical assisting.

{¶ 40} The trial court was entitled to decide which testimony to credit, since it was in the position to view the witnesses and assess their credibility. There is no doubt that Jenifer and Geoffrey are both loving parents and are involved with their children.

"[C]ustody issues are some of the most difficult and agonizing decisions a trial judge must make, * * * [and] a trial judge must have wide latitude in considering all the evidence before him or her." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). In this regard, the case before us is legally no different from many others (or, perhaps it is unique, like all the others). The choices are never easy, and we must defer to the trial court unless the court acted unreasonably, arbitrarily, or unconscionably. There is no evidence of such an attitude on the part of the trial court. To the contrary, the court was concerned about making the best decision for the children.

{¶ 41} For the same reasons, the court's decision was not against the manifest weight of the evidence. In this situation:

" 'The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting from *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001) (Other citations omitted.)

{¶ 42} In *Eastley*, the Ohio Supreme Court emphasized that:

In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable

presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id*. at ¶ 21, quoting from *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. (Other citation omitted.)

**{¶ 43}** Again, the trial judge was in the best position to assess credibility. Because the evidence is susceptible of more than one interpretation, we are required to adopt the interpretation that is consistent with the judgment.

**{¶ 44}** Accordingly, the second assignment of error is overruled.

## IV. Did the Trial Court Err in Limiting Parenting Time?

**{¶ 45}** Geoffrey's third assignment of error states that "It was an abuse of discretion for the trial court to unreasonably limit father's parenting time with the children over holidays and long weekends." In this regard, Geoffrey contends that the trial court's order of visitation is unreasonable because it means that he will not see the children from the beginning of their school year until Christmas vacation, and ignores the practice the parties had of alternating major holidays. Jenifer's brief does not specifically respond to these points.

**{¶ 46}** The trial court's order provides that Geoffrey is entitled to have the children for eight weeks in the summer, to be taken in one block or separated into two four-week blocks. Geoffrey is also allowed to have the children over spring break, and for Christmas,

consistent with the court's standard order of visitation. In addition, the court stated that Geoffrey is entitled to have parenting time in Missouri, upon providing Jenifer with 14 days notice. If Geoffrey wishes to see the children more often between the start of the school year and Christmas, or on long weekends, he has only to provide the proper notice and travel to Missouri. Furthermore, Jenifer will go without seeing the children for up to eight weeks at a time during the summer, with no opportunity for interim visits. In view of the distance between the parties, the court's order is not unreasonable, arbitrary, or unconscionable.

{¶ 47}    The third assignment of error is overruled.


V.    Did the Trial Court Err in Limiting Credit Against an Arrearage?

{¶ 48}    Geoffrey's fourth assignment of error states that "It was an abuse of discretion for the trial court to limit father's credit against his support arrearage to $1,224.00." In this regard, Geoffrey argues that the trial court acted unreasonably when it refused to credit him with more than $7,500 he paid to third-party creditors on Jenifer's behalf.

{¶ 49}    Geoffrey relies on Exhibit F, which allegedly shows $7,508.34 in payments to third-party creditors between May and October 2010. We have already indicated that $1,575.72 should have been credited to the arrearage due to payments for the van, which leaves $5,932.62. Reference to Exhibit F indicates that this amount includes $3,000 in temporary spousal support payments that were withheld from Geoffrey's wages and paid to the support enforcement agency. These were not payments to third-party creditors. The remaining amount was paid for daycare and car insurance for Jenifer's car.

{¶ 50}    Geoffrey argues that the court denied him due process by disregarding the Agreed Order of May 2010, which authorized him to make third-party payments in lieu of temporary spousal support.  We disagree.  The order in question only authorized him to make van payments in lieu of spousal support.   The order does not mention any other form of third-party payments, and Geoffrey is not entitled to deduct those items.

{¶ 51}    As was previously noted, the parties were unrealistic about the income required to support separate households.  Jenifer's income was not sufficient, even with temporary spousal support of $1,000 per month, to pay a $500 per month car payment, apartment rent of $550, and the many other expenses associated with maintaining a separate household.  We also note that Geoffrey received a tax refund of $4,750 during the divorce proceedings and gave Jenifer $1,000, thereby retaining an unequal portion.   In addition, the trial court relieved Geoffrey of paying the deficiency amount owed on the van after it was repossessed – a sum of approximately $7,965.85.   The trial court properly ordered Jenifer to pay this amount, since she failed to make the van payments.   Under the circumstances we find no abuse of discretion in failing to credit third-party payments.

{¶ 52}    The fourth assignment of error is overruled.


VI.   Did the Trial Court Err in Retaining Jurisdiction over Spousal Support?

{¶ 53}    Geoffrey's fifth assignment of error states that "It was an abuse of discretion for the trial court to retain jurisdiction over the duration of Defendant-Appellant's spousal support obligation."    Under this assignment of error, Geoffrey contends that the trial court abused its discretion by failing to provide a termination date for the spousal support.

In particular, Geoffrey relies on two cases in which we reversed trial courts, based on their failure to specify termination dates for spousal support. See *Parker v. Kohl-Parker*, 2d Dist. Montgomery No. 21760, 2007-Ohio-4895, and *Canfarelli v. Canfarelli*, 2d Dist. Montgomery No. 18145, 2000 WL 966165 (July 14, 2000). These cases do not support reversal of Jenifer's spousal support award.

{¶ 54} The trial court set spousal support for Jenifer in the amount of $1,000 per month for three years, thus providing a definite termination date. In contrast, we noted in *Parker* that the trial court had provided for support to terminate upon the death of either party or the wife's cohabitation, whichever occurred first. *Parker* at ¶ 80.[3]

{¶ 55} Similarly, in *Canfarelli,* the award was for an "indefinite period of time." *Canfarelli* at * 1. The alleged error, in both *Parker* and *Canfarelli*, was the failure to set a specific time period for termination. Our reasoning for reversing the spousal support award in *Canfarelli,* and for initially reversing the award in *Parker*, was based on the preference or presumption created "in favor of spousal support awards of definite duration" in *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 554 N.E.2d 83 (1990). *Parker* at ¶ 82.

{¶ 56} Consistent with *Kunkle*, the trial court set such a definite time period of three years for Jenifer's spousal support award. The trial court's retention of jurisdiction over the duration and amount of the award is also fully consistent with comments that we made in *Canfarelli*.

---

[3] This factual statement was actually incorrect, and was corrected on reconsideration, because the award, in fact, "contained a definitive end date of thirty months." *Parker v. Kohl-Parker*, 2d Dist. Montgomery No. 21760, 2007-Ohio-5877, ¶ 2. Based on this correction, we ended up affirming the spousal support award. *Id.*

{¶ 57} We noted in *Canfarelli* that an additional basis for reversal in *Kunkle* was the trial court's failure to reserve continuing jurisdiction over the award. *Canfarelli,* 2000 WL 966165, at * 4. In this regard, we stated that:

[I]f the trial court in this case had failed to reserve jurisdiction to modify the indefinite support award, that would clearly have been an abuse of discretion. See, *e.g.*, *Gullia v. Gullia* (1994), 93 Ohio App.3d 653, 661, 639 N.E.2d 822 (holding that failure to reserve jurisdiction to modify an indefinite award of support is an abuse of discretion). Our own district has even said that if spousal support is ordered for a substantial period of time and the economic condition of the parties is likely to change, a trial court abuses its discretion by not providing that the order is subject to later modification. See, *e.g.*, *Canales v. Canales* (March 17, 1989), Greene App. No, 88 CA 52, unreported, p. 8 (trial court should have reserved jurisdiction to modify where four-year sustenance alimony was awarded), and *Jackson v. Jackson* (Nov. 8, 1996), Montgomery App. No.15795, unreported, p. 3 (approving and following *Canales*, and holding that trial court should have reserved jurisdiction to modify, where support was awarded for three year period). As a result, we find nothing significant about the trial court's reservation of jurisdiction in the present case. *Id*. at * 5.

{¶ 58} In light of the above comments, the trial court did not abuse its discretion in retaining jurisdiction over Jenifer's spousal support award. As Jenifer points out, the retention of jurisdiction makes it possible for both parties to ask for modification of the award, should their economic circumstances change. In this regard, we note that Jenifer was scheduled to graduate shortly after the final decree of divorce, and if she is self-supporting, this retention of

jurisdiction might work in favor of Geoffrey.

{¶ 59} Based on the preceding discussion, the fifth assignment of error is overruled.

## VII.   Did the Trial Court Err in Applying a Coverture Formula?

{¶ 60} Geoffrey's sixth assignment of error states that "It was an abuse of discretion for the court to employ a coverture fraction calculation instead of a hypothetical calculation to divide Defendant/Appellant's non-vested military retirement benefits."

{¶ 61} The trial court used a coverture formula to divide the military retirement benefits that Geoffrey accrued during the marriage.   " ' "The coverture fraction takes the total years of marriage divided by the total years of [the former spouse's] service.   Under this method, [the recipient spouse] receives half of the coverture fraction multiplied by the value of the pension" at the time of retirement.' "   "The result of this method of computation is that the recipient [spouse] obtains a proportionate share of any post-divorce increase in the value of her former [spouse's] pension."   (Citations omitted.)   *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 60, n. 6 (2d Dist.).

{¶ 62} Geoffrey contends that the trial court should have used a "hypothetical retired pay award," because Jenifer should not be allowed to reap the financial rewards of any increases in pay or rank that Geoffrey achieves.   This argument is based on Jenifer's alleged refusal to pay the van payment and other misconduct during the proceedings, like leaving the state with the children.

The general rule is that pension or retirement benefits earned during the course of a marriage are marital assets and a factor to be considered not only in the division of

property, but also in relationship to an award of alimony. * * * [W]hen considering a fair and equitable distribution of pension or retirement benefits in a divorce, the trial court must apply its discretion based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension or retirement plan, and the reasonableness of the result; the trial court should attempt to preserve the pension or retirement asset in order that each party can procure the most benefit, and should attempt to disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage. *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178-179, 559 N.E.2d 1292 (1990) (Footnotes omitted.)

**{¶ 63}** The trial court did not act unreasonably or arbitrarily in applying a coverture formula. This is an accepted formula for dividing retirement benefits and its use was within the court's discretion.

**{¶ 64}** As support for his argument, Geoffrey cites *Fazenbaker v. Fazenbaker*, 11th Dist. Trumbull No. 2009-T-0131, 2010-Ohio-5400. In *Fazenbaker*, the trial court used a "fixed method of calculation," rather than a coverture fraction, to divide retirement benefits. This method uses the pay rate at the time of divorce and does not account for pay raises and promotions that occur after the divorce. *Id.* at ¶ 9. When the wife appealed, the court of appeals gave two reasons for affirming the trial court's decision: 1) it was required to presume the regularity of the trial court proceedings, based on the wife's failure to file a trial transcript; and 2) the divorce decree justified use of the fixed method, even though it limited the wife's share of the pension, because the decree divided the parties' other marital assets on terms that were highly favorable to the wife. *Id*. at ¶ 38-39. The husband's loss of equity in the martial

home was, therefore, balanced by the wife's loss of equity in his retirement, and the appellate court could not say there was an abuse of discretion. *Id*. at ¶ 40-41.

**{¶ 65}** These circumstances are not present in the case before us. There were no marital assets other than some personal property, and the debt that existed – the deficiency on the van – was assessed to Jenifer. Thus, the trial court took Jenifer's failure to pay for the van into consideration. Regarding the alleged misconduct in leaving the state with the children, this is not the type of behavior contemplated by the statutes pertaining to property division.

**{¶ 66}** Under R.C. 3015.171(A)(3)(a)(i), retirement benefits are classified as marital property. R.C. 3105.171(B) requires that marital property be divided equitably, and an equal division is presumed to be equitable. See R.C. 3105.171(C)(1) and (2). In *Robbins v. Robbins*, 2d Dist. Clark No. 06CA0136, 2008-Ohio-495, we noted that:

> [T]he basis for division of property, marital as well as separate, in R.C. 3105.171, takes no account of the fault of either party, with but one exception.
>
> R.C. 3105.171(E)(1) authorizes the court to make a greater award of marital property to one spouse upon a finding that the other spouse "has engaged in financial misconduct, including but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets." *Id*. Misconduct for which an unequal division of marital property may be ordered is necessarily financial in character. *Id*. at ¶ 15-16.

**{¶ 67}** In view of the above authority, the trial court could not have considered any type of alleged misconduct, other than financial, when dividing marital property. The court did take Jenifer's financial conduct into consideration by requiring her to pay for the van. This was equitable, and placed the parties in the position of being able to share equally in Geoffrey's

retirement. Consequently, the court did not abuse its discretion by choosing to apply a coverture formula to the division of Geoffrey's retirement benefits.

{¶ 68} The sixth assignment of error is overruled.


## VII. Conclusion

{¶ 69} The trial court's judgment will be reversed in part and remanded for correction of the amount credited to Geoffrey's arrearage. The judgment will be affirmed in all other respects.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Anthony F. Comunale
Dalma C. Grandjean
Hon. Timothy D. Wood